IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMEL R. STEVENS,

            Petitioner,                     No. 2:11-cv-3390 MCE CKD P

    vs.

RON BARNS,

            Respondent.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner, a state prisoner, is proceeding pro se with a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction for first degree murder with the use of a firearm, for which he was sentenced to a state prison term of fifty years to life with the possibility of parole. Petitioner claims that his first degree murder conviction was not supported by sufficient evidence; that the imposition of a consecutive sentence for the firearm enhancement violated principles of double jeopardy; and that jury instructions on the required mental state for murder were erroneous and prejudicial. (Dkt. No. 1 ("Ptn.").) Respondent has filed an answer (Dkt. No. 15), and petitioner has filed a traverse (Dkt. No. 25). Upon careful consideration of the record and the applicable law, the undersigned will recommend that the petition be denied.

////

## BACKGROUND

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, set forth the factual background as follows:

> On January 17, 2007, three teenage boys - Jeremy Basped, Lamar
> Gasaway, and Shelby Freeman - took the light rail train to Florin
> Road. They went to a nearby mini-mart, where Basped saw
> defendant and another boy leaving the store. The three boys bought
> some items and left after three to four minutes. When they left,
> defendant, aged 14, and his companion were outside.
>
> Defendant was standing by the door, where he exchanged words
> with Gasaway, who then punched defendant in the face. Gasaway
> hit defendant several times, but defendant did not strike back.
> Defendant put his head down and tried to grab Gasaway, but fell to
> the ground.
>
> Gasaway stood up seven to eight feet away and faced defendant,
> who pulled out a pistol as he stood up. Gasaway saw the pistol and
> ran toward the street. Eyewitnesses heard several shots as
> defendant pursued Gasaway.
>
> Gasaway was between 16 and 25 feet away when defendant started
> shooting. He fell once in a dirt area by the curb but got up and kept
> running onto Florin Road, where he fell in the middle of the street.
> Firefighters arrived shortly afterward but could not revive him.
> Gasaway died of a single gunshot wound to the chest from a
> .22-caliber bullet. The lack of stippling ruled out a contact wound.
>
> One eyewitness described the shooter as an African-American male
> of about 16 to 18 years of age, who was wearing a brown jacket
> with the number 32 on the back. The eyewitness saw the shooter
> run down a side street.
>
> A search of the scene found no gun or bullet cases, but officers
> discovered a damaged cell phone registered to defendant and a
> baseball cap. The phone contained a partial sample of DNA that
> matched defendant's, with a probable random match of 1 in 50 for
> African-Americans, 1 in 240 for Caucasians, and 1 in 130 for
> Hispanics. DNA from the hat matched defendant's sample, with a
> random match probability of 1 in 28 billion for African-Americans,
> 1 in 17 billion for Caucasians, and 1 in 30 billion for Hispanics.
>
> Defendant's home was searched two days after the murder.
> Defendant's student identification card was found in one bedroom,
> along with writings and photographs attached to the wall. Among
> the writings were such phrases as: "nigga be a Star or nigga be a
> bitch, watch a FAB nigga slippin' and bust his shit," "It's random
> season, picking random niggas for no reason," "It's random season,

killing random niggas for no reason," along with defendant's name and "9/17 of '06, aka Lil Stay." Defendant also had "South" and "SAC" tattooed on his arm, memorializing his claim to South Sacramento, the area around Florin Road.

Frederick Smith "kind of" knew defendant and was standing by the store with him on the day of the shooting. Defendant's nickname at the time was "Stay." They ran into three or four males inside the store, and met them again when they left. A fight broke out between defendant and one of the males, who tried to hit defendant in the face. Smith grabbed the attacker but was confronted by the attacker's two companions. Smith then blacked out, which happens when he gets mad.

Smith next remembered running through a parking lot to the house of a person named Reggie. He knew the Starz was a gang, but neither he nor defendant belonged to it.

Reginald Shamberger is a former member of the Starz gang. He was living with his mother on the day of the incident when defendant and his friend Freddy showed up at the house. He told the police that defendant was wearing a tan and black sweater with the number 32 on it. He let them in, and they stayed for about an hour. Defendant and his friend changed clothes before they left.

Defendant later told Shamberger he had left a gun at the house. Shamberger, a convicted felon, took the gun, a white-handled pistol, and tried to sell it before his mother put it in her room.

Davonte Stinson did not know if defendant was part of the Starz gang, and he denied providing details of the incident to the police. Stinson told the police Gasaway is a Blood, while defendant is part of the Starz gang. Gasaway said something about Oak Park, the neighborhood he was from, and hit defendant three times. Defendant then chased Gasaway with a gun, firing four rounds and hitting him.

Police searched the Shamberger residence. They found two handguns in a bedroom - a loaded, nine shot, .22-caliber revolver with white grips, and a loaded, nine shot, .22-caliber revolver with tan grips. The white revolver was the one Shamberger found at his house. Police also found a black and tan jacket with the number 32 on the back.

The bullet recovered from Gasaway's body could not have been fired from the tan revolver, but it could have been fired from the white one. There was gunshot residue on the jacket, but there was no way to determine when the jacket was exposed to gunshot.

Expert testimony on African-American street gangs established that gangs gain respect through fear and intimidation, which may

include fighting, stabbing, or shooting. Losing respect can cause a member to become ostracized.

There are several groups of the rival Crips and Bloods gangs in Sacramento. The Oak Park Bloods is the largest Bloods sect in Sacramento, and other Bloods sects are found in the Del Paso Heights and Meadowview neighborhoods. The letters "FAB" stand for the Fourth Avenue Bloods, a part of the Oak Park Bloods. There are several Starz sects in Sacramento, claiming territory in South Sacramento.

If a person from the FAB displayed to a Starz member clothing representing that he was a member of the FAB, it would show a lack of respect to the Starz, which would lead a Starz member to respond, possibly with violence. The presence of another Starz member would cause the responding person to react more violently. Some of the writing in defendant's room referred to gangs, being armed, handling disrespect, standing up for the Starz gang, and acts of violence. The phrase " 'watch a FAB nigga slippin' " referred to catching a member of a rival gang at a disadvantage, either by having more men or more weapons.

Defendant testified[1] that he and Smith went to Shamberger's house before the shooting, where they drank Remy Martin alcohol and smoked marijuana. Shamberger gave him a gun, which defendant kept when he and Smith left the house to buy cigarettes for Shamberger.

Gasaway bumped into defendant at the store. Defendant told him to "watch out," and Gasaway replied: "[B]itch ass nigga, I ain't got to watch where the fuck I'm going." Defendant bought some food and left.

Outside, Gasaway approached defendant, said something to him, punched him in the face, and wrapped his arms around defendant in a "bear hug." Defendant was scared and pulled out the gun to defend himself, aiming above Gasaway in order to scare him. He fired two or three times out of fear, when Gasaway was about five feet from him.

Basped and Freeman attended live lineups after the shooting but were unable to identify anyone.

(Lod. Doc. 4. at 2-6.[2])  The facts as set forth by the state court of appeal are presumed correct, 28

---

[1] The following three paragraphs summarize petitioner's testimony at trial.

[2] Lodged Documents refer to those documents lodged by respondent on May 7, 2012. (Lod. Doc. 17.)

4

1    U.S.C. § 2254(e)(1), and are consistent with this court's review of the record.

2              On September 10, 2008, following a jury trial in the Sacramento County Superior

3    Court, a jury found petitioner guilty of first degree murder (Cal. Penal Code § 187) and also

4    found true allegations that he used a firearm (Cal. Penal Code § 12022.53, subd. (d)) and was at

5    least 14 years of age at the time of the crime (Cal. Welf. & Inst. Code § 707, subd. (b)[3]).  (2 CT

6    301-302.)  On November 12, 2008, the trial court imposed a sentence of twenty-five years to life

7    for the first degree murder conviction and a mandatory additional term of twenty-five years to

8    life for the firearm enhancement, for an aggregate term of fifty years to life.[4]  (4 RT 1141.)

9              Petitioner appealed the judgment to the California Court of Appeal, Third

10   Appellate District.  (Lod. Doc. 1.)  On August 9, 2010, the court of appeal affirmed the judgment

11   in a reasoned decision.  (Lod. Doc. 4.)  Petitioner filed a petition for review in the California

12   Supreme Court, raising the same claims as on appeal.  (Lod. Doc. 5.)  The California Supreme

13   Court summarily denied review on November 17, 2010.  (Lod. Doc. 6.)

14             Petitioner commenced the instant federal action on December 21, 2011.  (Ptn.)

15                                          ANALYSIS

16   I.  AEDPA

17             The statutory limitations of federal courts' power to issue habeas corpus relief for

18   persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

19   Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

20                  An application for a writ of habeas corpus on behalf of a person in
                    custody pursuant to the judgment of a State court shall not be
21                  granted with respect to any claim that was adjudicated on the

22
      _____

23        [3] This and related provisions allow for a minor alleged to have committed murder (or
      various other offenses) at age fourteen or older to be tried as an adult.

24        [4] Cal. Penal Code 12022.53, subd. (d) provides that "any person who, in the commission
25    of a [specified felony, including murder], personally and intentionally discharges a firearm and
      proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall
26    be punished by an additional and consecutive term of imprisonment in the state prison for 25
      years to life."

                                              5

merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those

1   arguments or theories are inconsistent with the holding in a prior decision of this Court." Id.

2   "Evaluating whether a rule application was unreasonable requires considering the rule's

3   specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

4   case-by-case determinations.'" Id.  Emphasizing the stringency of this standard, which "stops

5   short of imposing a complete bar of federal court relitigation of claims already rejected in state

6   court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does

7   not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v.

8   Andrade, 538 U.S. 63, 75 (2003).

9           The undersigned also finds that the same deference is paid to the factual

10  determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

11  presumed to be correct subject only to a review of the record which demonstrates that the factual

12  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

13  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

14  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

15  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

16  same record could not abide by the state court factual determination.  A petitioner must show

17  clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

18  U.S. 333, 338 (2006).

19          The habeas corpus petitioner bears the burden of demonstrating the objectively

20  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

21  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

22  court's ruling on the claim being presented in federal court was so lacking in justification that

23  there was an error well understood and comprehended in existing law beyond any possibility for

24  fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787.  Clearly established" law is

25  law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van

26  Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will

1    not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006)

2    (established law not permitting state sponsored practices to inject bias into a criminal proceeding

3    by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed

4    guards does not qualify as clearly established law when spectators' conduct is the alleged cause

5    of bias injection).  The established Supreme Court authority reviewed must be a pronouncement

6    on constitutional principles, or other controlling federal law, as opposed to a pronouncement of

7    statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

8            The state courts need not have cited to federal authority, or even have indicated

9    awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the

10   state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

11   federal court will independently review the record in adjudication of that issue.  "Independent

12   review of the record is not de novo review of the constitutional issue, but rather, the only method

13   by which we can determine whether a silent state court decision is objectively unreasonable."

14   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

15           "When a state court rejects a federal claim without expressly addressing that

16   claim, a federal habeas court must presume that the federal claim was adjudicated on the merits –

17   but that presumption can in some limited circumstances be rebutted."  Johnson v. Williams, No.

18   11-465, slip op. at 10, 568 U.S. ____ (Feb. 20, 2013).  "When the evidence leads very clearly to

19   the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles

20   the prisoner to" de novo review of the claim.  Id., slip op. at 13.

21   \\\\\

22   \\\\\

23   \\\\\

24   \\\\\

25   \\\\\

26   \\\\\

1  II. Petitioner's Claims

2  A. Insufficient Evidence[5]

3          1. Claim

4          Petitioner challenges his conviction on due process grounds, claiming there was

5  insufficient evidence of deliberation and premeditation to support a first degree murder

6  conviction.  He asserts that there was no evidence that he "armed himself and set out to kill

7  another rival gang member."  (Ptn. at 10.)  He further asserts that the "rhyme and rhythm

8  writings" found in his bedroom did not show that he was "premeditating, deliberating, and

9  planning to kill a gang member (i.e., Mr. Gasaway)."  (Id. at 12.)  Petitioner contends that, rather

10  than planning to kill Gasaway in advance, he shot him "out of fear of his life" after Gasaway beat

11  petitioner, and that the evidence supports only a voluntary manslaughter conviction.  (Id. at 9,

12  14.)

13          2. State Court Opinion

14          In the last reasoned decision on this issue, the Court of Appeal for the Third

15  Appellate District addressed petitioner's claim as follows:

16          Defendant contends there is insufficient evidence of premeditation
             and deliberation to support his conviction for first degree murder.
17          We disagree.

18          Premeditation and deliberation require more than the reflection
             necessary to form the specific intent to kill. (People v. Anderson
19          (1968) 70 Cal.2d 15, 26 (Anderson).)  However, to establish this
             mental state, it is not "necessary to prove the defendant maturely
20          and meaningfully reflected upon the gravity of his or her act." (§
             189.)  "The act of planning - involving deliberation and
21          premeditation - requires nothing more than a 'successive thought[ ]
             of the mind.' [Citations.]" ( People v. San Nicolas (2004) 34
22          Cal.4th 614, 658.)

23          In Anderson, the Supreme Court identified three categories of
             evidence that have been found sufficient to sustain a finding of
24          premeditation and deliberation: (1) facts showing planning activity,

25  _____

26          [5] Petitioner argues in Claims I and IV of the petition that the evidence was insufficient to
    support a first degree murder conviction.  The court addresses these arguments as one claim.

(2) facts suggesting motive, and (3) facts about the manner of killing that suggest a preconceived design. (Anderson, supra, 70 Cal.2d at pp. 26-27.) "[I]t is not necessary that the Anderson 'factors be present in some special combination or that they be accorded a particular weight.' [Citation.]" (People v. Sanchez (1995) 12 Cal.4th 1, 33 (Sanchez ), disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.) These categories are intended to provide guidance for appellate review and are not prerequisites to establishing premeditation and deliberation. (People v. Mayfield (1997) 14 Cal.4th 668, 768.)

A first degree murder verdict is proper when there is evidence of all three Anderson factors, when there is extremely strong evidence of planning, or when there is evidence of motive in conjunction with either planning or the manner of killing. (Sanchez, supra, 12 Cal.4th at p. 32.) Applying the Anderson factors and the evidence adduced at trial in the light most favorable to the prosecution, we conclude there is sufficient evidence to support findings of premeditation and deliberation. (People v. Elliot (2005) 37 Cal.4th 453, 471 (Elliot).)

Defendant claims the "credible evidence is that [he] fired in a panicked response to his being attacked." Defendant's interpretation places too much credence on his self-serving testimony. Eyewitness testimony established Gasaway was 20 to 25 feet from defendant and running away when the shots were fired. This was not a panicked response attack. It was premeditated and deliberate murder.

There is substantial evidence of planning. Defendant obtained a pistol from Shamberger's house that day and had the loaded, concealed weapon with him during the fatal encounter with Gasaway. A conscious decision to arm oneself is evidence of planning. (Elliot, supra, 37 Cal.4th at p. 471; People v. Wharton (1991) 53 Cal.3d 522, 547.) This inference is strengthened by the writing in defendant's room expressing his willingness to kill others and his hostility to members of rival gangs.

Defendant's association with the Starz gang is powerful evidence of motive. Eyewitness and expert testimony established defendant and Gasaway were members of opposing gangs, and a show of disrespect from a member of another gang can lead to violent retaliation. Being bested by a member of a rival gang in front of his friend gave defendant a motive to kill Gasaway. "A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation." (People v. Rand (1995) 37 Cal. App.4th 999, 1001.)

\\\\\

10

Last, the method of killing supports an inference of premeditation and deliberation.  Defendant's decision to pursue a fleeing person who was no longer a threat and to fire multiple shots at him shows a pre-conceived design to kill a member of a rival gang. It was reasonable for the jury to conclude defendant premeditated and deliberated Gasaway's murder.

(Lod. Doc. 4 at 7-9.)

### 3.  Legal Standard

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir. 1985). If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275 & n. 13.

### 4.  Discussion

On federal habeas review, the court applies the Jackson standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." Davis v. Woodford, 384 F.3d 628, 639 (9th Cir. 2004), citing Jackson, supra, at 324 n. 16.  Under California law, a "wilful, deliberate, and premeditated killing . . . is murder of the first degree."

11

1   Cal. Penal Code § 189. "Deliberation" and "premeditation" must be construed to require "more

2   reflection than may be involved in the mere formation of a specific intent to kill." People v.

3   Anderson, 70 Cal.2d 15, 26 (1968). Anderson explains that in reviewing verdicts of first degree

4   murder, the court looks to evidence of (1) planning, (2) motive, and (3) facts "from which the

5   jury could infer that the manner of killing was so particular and exacting that the defendant must

6   have [had] ... a 'preconceived design[.]'" 70 Cal. 2d at 26-27. Such verdicts are typically

7   sustained "when there is evidence of all three types; otherwise, there must be "at least extremely

8   strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." 70 Cal. 2d at 27.

9        Here, the state court concluded that there was "substantial evidence of planning,"

10  citing petitioner's acquisition of a gun and his carrying of the loaded, concealed weapon to the

11  store. As petitioner and Gasaway did not know each other prior to their chance meeting on

12  January 17, 2007, there is no evidence that petitioner planned to kill Gasaway personally. Thus

13  the question is in what sense, if any, petitioner can be said to have "planned" the killing.

14       In People v. Elliot (2005) 37 Cal.4th 453, cited by the state court of appeal on this

15  issue, the connection between the defendant's acquisition of a weapon and his "plan" to use it are

16  stronger than in the instant case. In Elliot, defendant was convicted of the torture-murder of a

17  bartender after the bar had closed; he was also convicted of felony murder based on evidence that

18  he "ambushed [the victim] after she closed the bar, forced her at knifepoint into the back room,

19  and then inflicted fatal wounds as part of the attempted robbery." Id. at 470. On these facts, the

20  California Supreme Court reasoned: "That defendant armed himself prior to the attack supports

21  the inference that he planned a violent encounter." Id. at 471 (citation omitted). However, the

22  overall nature of the crime – including an ambush and unprovoked attack – is more indicative of

23  planning than the instant facts.

24       In People v. Romero, 44 Cal. 4th 386, 401 (2008), the California Supreme Court

25  held that the jury could infer "planning" from evidence that defendant brought a gun to a video

26  store, where he proceeded to kill a rival gang member with a single, "execution-style" shot. Id.

1   In that case, "without any warrant or apparent awareness of the impending attack, [the victim]

2   was shot in the back of the head." 44 Cal. 4th at 401.  Despite some similarities to the instant

3   case, Romero is distinguishable because there was no provocation by the victim, and thus no

4   question of whether defendant's actions were a spontaneous reaction to events.

5          Closer to the instant facts is People v. Wharton, 53 Cal. 3d 522 (1997), also cited

6   by the court of appeal on the "planning" factor.  In that case, defendant argued that he killed his

7   live-in girlfriend with a hammer "during a spontaneous and uncontrolled explosion of anger,

8   frustration, and rage." Id. at 546.  The California Supreme Court upheld his first degree murder

9   conviction, reasoning that "the fact that the hammer . . . was not found in the toolbox suggests

10  defendant may have removed it ahead of time and placed it nearby, planning to be in a rage[,]"

11  and that this was "indicative of planning activity" under the Anderson test. Id. at 547.  This is

12  analogous to petitioner carrying a loaded gun in his pocket, where it was ready to use in the event

13  that he became angry, encountered a rival gang member, or both.  However, there is no evidence

14  that petitioner actually "planned" to kill someone when he and his friend went to the mini-mart

15  for chips and cigarettes on January 17, 2007.

16         The state court reasoned that the inference of planning raised by petitioner's gun

17  was "strengthened by the writing in room expressing his willingness to kill others and his

18  hostility to members of rival gangs."  As evidence of planning, this too is weak.  In People v.

19  Rand, 37 Cal. App. 4th 999, 1001 (1995), the state court of appeal held that a "a pre-planned,

20  purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences

21  the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation."

22  However, unlike in Rand, which concerned a drive-by shooting, the evidence here suggests that

23  petitioner formed the intent to shoot only after a rival gang member punched him repeatedly

24  while their friends watched – a provocation petitioner could not have foreseen.  In sum, the

25  undersigned disagrees with the state court's determination that there was "substantial evidence of

26  planning" in this case.

1    However, under <u>Anderson</u>, in the absence of evidence of planning, a first degree

2  murder conviction can be sustained based on evidence of (2) motive and (3) manner of killing.

3  The state court reasonably determined that petitioner's gang association, general hostility toward

4  FAB gang members, and circumstances in which he was "bested by a member of a rival gang in

5  front of his friend" was strong evidence of motive to kill.  <u>See</u> <u>Romero</u>, 44 Cal. 4th at 401

6  (finding evidence of motive where there was testimony that defendant and victim were members

7  of rival gangs and victim was wearing a shirt signifying gang membership at the time of the

8  shooting).

9    As to manner of killing, witnesses testified that petitioner chased Gasaway while

10  shooting at him.  The state court concluded that petitioner's "decision to pursue a fleeing person

11  who was no longer a threat and to fire multiple shots at him shows a pre-conceived design to kill

12  a member of a rival gang."  "California law recognizes that premeditation can occur in a short

13  period of time, provided that the evidence demonstrates 'cold, calculated judgment' on the part

14  of the killer."  <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000), citing <u>People v. Perez</u>, 2

15  Cal. 4th 1117, 1127 (1992).  In <u>People v. Poindexter</u>, 144 Cal. App. 4th 572, 588 (2006), the

16  state court of appeal upheld a first degree murder conviction, reasoning:

17
18            The manner of killing, while not an execution-style single shot to
             the head, could still support a finding of premeditation and
19            deliberation, as defendant quickly fired three shots at the victim,
             with a shotgun, from a relatively close range. Thoughts may indeed
20            flow with great rapidity. The evidence here supports a reasonable
             conclusion that defendant's decision to kill, although quickly
21            formed, was the result of a cold and calculated judgment and
             decision.

22  Similarly here, the state court of appeal could reasonably conclude that petitioner's decision to

23  pursue Gasaway and fire multiple shots at him was a "manner of killing" that reflected a cold,

24  calculated judgment by petitioner.  <u>See</u> <u>also</u> <u>People v. Sanchez</u>, 26 Cal. 4th 834, 850 (2001)

25  ("Premeditation can be established in the context of a gang shooting even though the time

26  between the sighting of the victim and the actual shooting is very brief.").

1    In sum, viewing the evidence in the light most favorable to the prosecution[6], the

2    undersigned concludes that there was sufficient evidence of motive and manner of killing that the

3    state court's decision was not objectively unreasonable under the deferential AEDPA standard.

4    Thus petitioner is not entitled to federal habeas relief on this claim.

5    B.  Double Jeopardy[7]

6    Petitioner next claims that his additional twenty-five-year sentence for the firearm

7    enhancement, imposed pursuant to California Penal Code section 12022.53, violates principles of

8    double jeopardy.  He argues that the firearm enhancement should be treated as the equivalent of a

9    lesser included offense within first degree murder rather than a separate, punishable offense.

10   The state court of appeal addressed this claim as follows:

11   The court sentenced defendant to 25 years to life for first degree
     murder and imposed a consecutive 25 years to life enhancement for
12   personally and intentionally discharging a firearm, resulting in
     death. (§ 12022.53, subd. (d).)  Defendant contends the firearm
13   enhancement is necessarily included in the offense of first degree
     murder, and punishing him under both provisions constitutes
14   double jeopardy.

15   Defendant recognizes his claim has been rejected by the California
     Supreme Court.  (People v. Izaguirre (2007) 42 Cal.4th 126,
16   130-131; People v. Sloan (2007) 42 Cal.4th 110, 115-123.)  We are
     bound by those decisions, and reject defendant's contention. (Auto
17   Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

18   (Lod. Doc. 4 at 13-14.)

19   The Double Jeopardy Clause contains three distinct constitutional protections.

20   See Plascencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006).  "It protects against a second

21   prosecution for the same offense after acquittal.  It protects against a second prosecution for the

22   _____

23   [6] Petitioner argues in the traverse that the trial court erroneously admitted prejudicial
     evidence of petitioner's tattoo and rap lyrics.  This argument was not presented to the California
24   Supreme Court (see Lod. Doc. 5); moreover, is not appropriate to raise new arguments in a
     traverse.  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

25   [7] Petitioner argues in Claims II and V of the petition that his consecutive sentence for the
     firearm enhancement violates double jeopardy.  The court addresses these arguments as one
26   claim.

1  same offense after conviction.  And it protects against multiple punishment for the same

2  offense."  <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717 (1969); <u>see also</u> <u>Brown v. Ohio</u>, 432 U.S.

3  161, 165 (1977).

4          In <u>Plascencia</u>, 467 F.3d at 1204, the Ninth Circuit analyzed whether a petitioner's

5  sentence for murder in addition to a twenty-five years to life enhancement for using a firearm

6  constituted double jeopardy.  The Ninth Circuit explained that the United States Supreme Court

7  in <u>Missouri v. Hunter</u>, 459 U.S. 359, 366 (1983)

8          made clear that the protection against multiple punishments for the
          same offense did not necessarily preclude cumulative punishments
9          in a single prosecution. The key to determining whether multiple
          charges and punishments violate double jeopardy is legislative
10         intent. When the legislature intends to impose multiple
          punishments, double jeopardy is not invoked.
11

12  <u>Plascencia</u>, 467 F.3d at 1204.  The Ninth Circuit continued by stating that the language of Cal.

13  Penal Code section 12022.53 is clear and that there is no question that the California legislature

14  "simply determined that a criminal offender may receive additional punishment for any single

15  crime committed with a firearm."  <u>Id.</u>  Here as in <u>Plascencia</u>, the state court's decision to uphold

16  the consecutive term for the firearm enhancement was not an unreasonable application of

17  established federal law.  Thus petitioner is not entitled to habeas relief on this claim.

18  C.  <u>Instructional Error</u>

19          In Claim III, petitioner argues that the jury instruction on the effect of

20  provocation, combined with the instruction on voluntary manslaughter, misinformed the jury that

21  it should apply an objective standard of reasonableness in determining the provocation necessary

22  to reduce an act from first to second degree murder.

23          The state court of appeal addressed this claim as follows:

24          The jury was instructed with CALCRIM No. 522, which states:
          "Provocation may reduce a murder from first degree to second
25          degree and may reduce a murder to manslaughter. The weight and
          significance of the provocation, if any, are for you to decide. [] If
26          you conclude that the defendant committed murder but was

provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury was next instructed with CALCRIM No. 570, which states a killing that is otherwise murder is reduced to voluntary manslaughter because of a sudden quarrel or heat of passion. The instruction tells the jury that a finding of sudden quarrel or heat of passion requires the defendant to have been provoked, so "the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment[.]" The instruction defines the necessary provocation to reduce murder to voluntary manslaughter under an objective standard: "The provocation would have caused an ordinary person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Voluntary manslaughter is "the unlawful killing of a human being without malice .... [] (a) ... upon a sudden quarrel or heat of passion." (§ 192; see People v. Saille (1991) 54 Cal.3d 1103, 1114.) Evidence the accused acted upon a sudden quarrel or heat of passion provoked by adequate provocation overcomes the presumption of malice. (People v. Breverman (1998) 19 Cal.4th 142, 153-154; Saille, supra, 53 Cal.3d at p. 1114.)  The provocation or circumstances giving rise to the heat of passion are viewed objectively. (People v. Steele (2002) 27 Cal.4th 1230, 1252-1253.)

Provocation can also reduce first degree murder to second degree murder, but the test for determining whether provocation negates the elements of deliberation and premeditation is a subjective one. (See People v. Wickersham (1982) 32 Cal.3d 307, 327, disapproved on other grounds in People v. Barton (1995) 12 Cal.4th 186, 201; People v. Padilla (2002) 103 Cal.App.4th 675, 679.)  "If this were not so, the provocation would be a defense to murder and would be sufficient to reduce the crime to manslaughter." (People v. Fitzpatrick (1992) 2 Cal.App.4th 1285, 1295 (Fitzpatrick).)

Defendant argues the instructions effectively removed the issue of his subjective mental state from the question of whether the murder was deliberate and premeditated.  He is mistaken.

Defendant did not object to this instruction, which "forfeits the objection on appeal unless the defendant's substantial rights are affected. [Citations.]"  (People v. Mitchell (2008) 164 Cal. App.4th 442, 465; § 1259.)  We conclude the instructions did not deprive defendant of his substantial rights.

\\\\\

"On review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt be-yond a reasonable doubt. [Citation.]" (People v. Paysinger (2009) 174 Cal.App.4th 26, 30.)

In addition to CALCRIM Nos. 522 and 570, the court also instructed the jury with CALCRIM No. 521, which establishes the difference between first and second degree murder. In pertinent part, this instruction states: "The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death."

Read together, CALCRIM Nos. 521, 522, and 570 accurately inform the jury of the necessary mental state for first degree murder.  CALCRIM No. 521 defines the mental state for first degree murder - willful, deliberate, and premeditated - as a function of the defendant's subjective mental state. (See Fitzpatrick, supra, 2 Cal.App.4th at p. 1296 ["A requirement that the jury find premeditation and deliberation necessarily includes a requirement that the jury consider the defendant's mental state"].) Next, CALCRIM No. 522 correctly informs the jury that provocation can reduce first degree murder to second degree, or murder to manslaughter.  Finally, CALCRIM No. 570 instructs the jury that the provocation necessary to reduce murder to voluntary manslaughter is evaluated under an objective standard.

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citations.]" (People v. Scott (1988) 200 Cal.App.3d 1090, 1095.) The jury was told that provocation could negate the subjective mental state of premeditation and deliberation, but in order to reduce murder to manslaughter, the provocation must be reasonable. This is a correct statement of the law.

"Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (Boyde v. California (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 329].)  The instructions allowed the jury to consider defendant's subjective provocation in determining whether the murder was premeditated and deliberate.

\\\\\\

18

Even if the instructions were erroneous and not forfeited, the error would be harmless beyond a reasonable doubt. ( People v. Lamas (2007) 42 Cal.4th 516, 526 [instructional error on an element subject to the harmless beyond a reasonable doubt standard of review].)  As we have already discussed, there was compelling evidence of premeditation and deliberation under all three of the Anderson factors - planning, motive, and the method of killing.

Defendant started shooting at Gasaway when he was over 20 feet away and running from him, clearly after their fight had ended. We are convinced beyond a reasonable doubt that an instruction more explicitly applying a subjective standard would not have influenced the jury's verdict.

(Lod. Doc. 4 at 9-13.)

"[F]ederal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68.  To obtain federal habeas relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See id.  In reviewing a faulty instruction, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. Id. at 72, n. 4.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475–76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an " 'especially heavy burden.' " Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  Even if there is an instructional error, a habeas petitioner is not entitled to relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

\\\\\

1    In this case, the challenged instructions did not violate petitioner's right to due

2    process.  The state court of appeal determined that the instructions correctly set forth the mental

3    states required for first degree murder, second degree murder, and voluntary manslaughter under

4    California law.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (Supreme Court "has repeatedly

5    held that a state court's interpretation of state law, including one announced on direct appeal of

6    the challenged conviction, binds a federal court sitting in habeas corpus.")  In doing so, the state

7    court properly considered the challenged instructions in the context of the accompanying

8    instructions, see Estelle, supra, 502 U.S. at 72, and its conclusion does not offend clearly

9    established Supreme Court precedent.  Therefore, petitioner is not entitled to relief on this claim.[8]

10    Accordingly, IT IS HEREBY RECOMMENDED THAT:

11    1.  The petition (Dkt. No. 1) be denied; and

12    2.  This case be closed.

13    These findings and recommendations are submitted to the United States District

14    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

15    days after being served with these findings and recommendations, any party may file written

16    objections with the court and serve a copy on all parties.  Such a document should be captioned

17    "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

18    may address whether a certificate of appealability should issue in the event he files an appeal of

19    the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

20    court must issue or deny a certificate of appealability when it enters a final order adverse to the

21    applicant).  Any reply to the objections shall be served and filed within fourteen days after

22    service of the objections.  The parties are advised that failure to file objections within the

23

24    _____

        [8] In light of this determination, the court need not address respondent's argument that this
25    claim is procedurally barred.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (a district
      court may reach the merits of a habeas petitioner's claim where, as here, the merits are "easily
26    resolvable against the petitioner whereas the procedural-bar issue involve[s] complicated issues
      of state law.")

1  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

2  F.2d 1153 (9th Cir. 1991).

3   Dated: May 2, 2013

4

5                                                          CAROLYN K. DELANEY
                                                          UNITED STATES MAGISTRATE JUDGE
6  2stev3390.hc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26